FILED
2025 MAR 14
CLERK
U.S. DISTRICT COURT

Rainer Friedrich Huck
1680 East Atkin Avenue
Salt Lake City, Utah 84106
Telephone (801) 201-9660
Email: rfhuck@yahoo.com
*Pro Se*

John Anderson
629 Lake Street #3
Salt Lake City, Utah 84102
Telephone: (801) 688-3192
Email: LANDLORD@SISNA.COM

*Pro Se*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RAINER F. HUCK, an individual, JOHN ANDERSON, an individual, Plaintiffs, vs. BUREAU OF LAND MANAGEMENT, US DEPARTMENT OF THE INTERIOR Defendants. | **COMPLAINT** Case: 2:25-cv-00194 Assigned To : Oberg, Daphne A. Assign. Date : 3/14/2025 Description: Huck et al v. Bureau of Land Management et al |

TO THE HONORABLE JUDGE OF SAID COURT:

1    This action concerns the rampant elimination of public access to, and travel upon, the

public lands of the United States. Plaintiffs maintain that all Americans, regardless

of religion, age, race, health, strength, economic standing, and especially those who are

elderly, handicapped or disabled, have Constitutional and other legal rights to access

public lands held under the jurisdiction of the Bureau of Land Management ("BLM") on

a basis equal to those who have the strength and ability to travel by muscle power, even

if doing so means that the handicapped or disabled must access those public lands via

mechanized means.

2    Tragically, the majority of our most beautiful public lands are now off-limits to most

Americans, particularly our most vulnerable – the aged, the disabled, the handicapped,

and anyone else with mobility impairments; all because of actions of the elitist and selfish

actions of so called "Environmentalist" organizations, many of which are improperly

operating as 501(c)(3) charitable or non-profit organizations. The predominant reason

asserted by those organizations for denying all of the American public access to these

public lands is to "protect" them, which implies that the public lands have "personhood"

or are "sentient" which entitles them to such protection at the expense of the American

people.

3    These "Environmental" organizations have persuaded Congress and government

agencies to violate the United States Constitution and other federal statutes and

regulations. This is done through designating land as "Wilderness", even though the land fails to meet the statutory requirements for such designations, as well as through massive administrative closures to people on motor vehicles in order to prepare these lands for future Wilderness designations.

4    The BLM, as well as other public land management agencies having been conducting what amounts to a pogrom against people who use motorized means to access public lands. It is essentially creating two classes of citizens: Those who are welcomed and have unfettered access to public lands because they are able-bodied and ideologically aligned with the "Environmentalist" organizations; and all others who are subjected to unrelenting regulation, loss of access, taxation, threat of criminal fines and civil penalties from the government, and villainization in the media.   The BLM has created vast vehicle-free zones on public lands which discriminate racially, economically, and by health status.   People who love to access and explore public lands have been divided by the hateful rhetoric and litigation spawned by the "Environmentalist organizations." Government policies, under direction of what we call "Earth Religionists" have long been so arbitrary and capricious that they drove away TV's first Reality Show, Mark Burnett's "Eco-challenge" in 1995, which could have been a huge and continuing economic boom to the people of Southern Utah. After all the senseless bureaucratic obstacles and hassles, he vowed never to return to Utah, and never did.  It should be noted that the Eco-challenge turned out to be a massive hit which bestowed great wealth to venues outside of Utah.

6    Another, much more impactful example of an improper administrative action, occurred on September 15, 2006, when BLM Richfield District Manager Cornell

Christensen closed nearly the entire Factory Butte recreation area to people using vehicles with just "a stroke of his pen." An entity called the "The Utah Shared Access Alliance" with substantial support of affected county, local and state representatives favored the creation of a Special Management Recreation Area that preserved motorized access patterns to the area that had been in use for at least three generations. The area around Factory Butte, which resembles a barren Martial landscape shaped by endless erosion, has terrain that is uniquely suited to motorized recreation.

7    Mr. Christensen, however, thwarted the will of the people by invoking the Endangered Species Act purportedly with respect to the "Wrights Fish Hook Cactus" (sclerocactus wrightiae) and issued an "emergency" vehicle closure in a geographic area that almost perfectly mirrored the Motorized Recreation Management Plan developed by the Utah Shared Access Alliance and which had been incorporated into the Resource Advisory Council's plan for the Factory Butte recreation area. Incredibly, none of the Wrights Fish Hook Cactus grew anywhere near Factory Butte. Further, the Factory Butte area is seldom visited by hikers or horseback riders. This closure was the corrupt product of collusion between the BLM and the Earth Religionists (also known as environmentalists) and will be a major focus of this litigation.

8    A more recent egregious example is found in the Moab, Utah area, where the BLM closed historic and traditional access to Bull Canyon and to the Gemini Bridges denying access to these scenic wonders to all those unable to walk from the road closure point. Just last year the BLM closed 49 miles of spur roads in the Canyon Rims area that provided spectacular vistas of the Canyonlands from an elevation of 2,000 ft above the basins.  In 2023, the BLM closed more than 317 miles of roads and trails in the Labyrinth

3

Rims area west of Moab that had been used almost exclusively for motorized recreation for the past 60 years. Some of these roads are over 100 years old and reach beautiful destinations. In a very cynical move, in the waning days of the Biden Administration, the BLM closed over 600 miles of roads and trails in the San Rafael Swell area, in the hours just before midnight of New Year's Eve. This is an area already suffering massive road closures from the Wilderness Designations of the Dingle Act. These closures serve only one purpose: To prepare the areas in question for future Wilderness Designation. In addition, the BLM closed all of the primitive campsites along highway 313 that were used by people in vehicles and the closed all campgrounds that accommodated recreational vehicles in Kane Creek Canyon, Moon Flower Canyon, along the Potash Road, as well as most dispersed camping in the San Rafael Swell.

9      Another example can be found in the south end of the Henry Mountains in the Henry Mountains Resource Area when the BLM used heavy equipment and disturbed thousands of tons of soil to dig up a beautiful two-track jeep road that had led to an extraordinary and unique rock out cropping. Plaintiff Huck made a FOIA request concerning the legal basis for this destructive action but the BLM declined to provide information.

10      One of the most recent examples of this elimination of access to public lands by mechanized means concerns roads within the San Rafael Swell area of Utah in tracts of land which have now been designated as "Wilderness." That designation was made contrary to existing law and deprives the Plaintiffs and other aged, handicapped or disabled people access to public lands to which they formerly had access. There is no rational basis for the designation of certain areas as wilderness and eliminating mechanized access to them especially for the aged, handicapped and disabled. In fact,

several of the areas designated as "wilderness" did not meet the statutory requirements for designation as a wilderness area because of the existence of roadways and pervasive historic mining activity within those areas. There is no justification for the BLM and other government agencies to ignore prior law recognizing the status of traditional and historic roadways, and instead eliminate those roadways upon public lands. Currently, the BLM, in collusion with the Earth Religionist organizations, is working to "remediate" (meaning destroy) existing roads both inside of and adjacent to the newly designated Wilderness areas, all without addressing the legally mandated NEPA process for such actions.

11    Congress has previously violated the Establishment Clause and other federal law by passing the Washington County Wilderness Act which closed mechanized access to land known as "Canaan Mountain" south of Zions National Park. This "Wilderness" area did not qualify for such designation because it had been heavily logged to provide lumber for early development of St. George, Utah and contained an historic sawmill. This area was accessed by mechanized travel via the Canaan Mountain Sawmill Road which the BLM administratively closed in the 1970s, but it was used and continued to be used by local residents. The Canaan Mountain Sawmill Road was a traditional and historic road grandfathered with the 1976 passage of the Federal Land Policy and Management Act and should not have been closed to motorized travel

12    The administrative designations by the BLM and the Wilderness designations made by Congress were made in violation of the First Amendment's Establishment Clause. Those actions have been justified by acceptance, establishment, and support of various "Earth-religions" which hold beliefs in a "Gaia" or a "Mother Earth" and whose gospels

falsely imbue land as having anthropomorphic features in need of "protection", even though mechanized travel in general, but especially for the handicapped or disabled, poses no threat to the land or the environment and poses dramatically less risk and harm than "Mother Nature" herself exerts upon the land. As an exemplar of the "Earth-religionist," "Gaia," or "Mother Earth" beliefs; on September 11, 2020, Speaker of the House, Nancy Pelosi, said "Mother Earth is angry. She's telling us, whether she's telling us with hurricanes on the Gulf coast, fires in the West, whatever it is, that the climate crisis is real and has an impact."

13    As examples of the fanaticism of the environmentalists, Plaintiff Huck, in his many travels on the public lands, has suffered verbal abuse and threats of physical violence, and he has encountered dangerous "booby-traps" placed on the public lands by the devout Earth-religionists who have been emboldened to do so by the incendiary language and hate speech directed by Earth-religionists toward people who use motor vehicles on public lands and who are seen as defacing or injuring their Goddess Gaia. These incidents have been deeply troubling and emotionally stressful to Plaintiff Huck.

14    Further, the BLM has long treated motor-assisted travelers including the aged, disabled and handicapped, as second-class citizens who are allowed access to public lands and facilities only at the pleasure of the Earth-religionists, and can be expelled whenever their presence becomes inconvenient. This discrimination parallels, in many ways, the treatment afforded our African-American citizens to public facilities until the enactment of the Civil Rights Act.

Many of the decisions to bar citizens, including Plaintiffs, from areas under the jurisdiction of the BLM have resulted from arbitrary and capricious actions taken by the BLM based upon purported reasons that were contrived and/or pretextual.

15    Plaintiffs also seek immediate temporary, preliminary and permanent injunctive relief precluding the BLM from enforcing any statutes, regulations or penalties against mechanized travel on all lands, roads, and trails that were open to motorized travel at the time of the passage of FLPMA in 1976.

# DESCRIPTION OF THE PARTIES

16    Plaintiff, Rainer F. Huck, ("Huck"), is a United States citizen and resident of the State of Utah. Huck is 78 years old and has physical disabilities that prevent his access to public lands under the jurisdiction of the BLM. More particularly, Huck suffers from severe Asthma and COPD which prevents him from hiking even short distances. Huck has been an avid off-road motorcyclist for over 50 years. He has been prevented and deprived from being able to visit scenic and recreational areas that he has previously been allowed to visit because of the decisions of the BLM limiting motorized access to those areas.

17    During the Summers of 2020, 2021, 2022, 2023, and 2024, Huck intended to go on off-road motorcycle trips as he has for over 50 years, and it is his intent in the Spring of 2025 to go on off-road motorcycle trips to areas within Utah which the BLM presently bars vehicular travel and/or which have been improperly designated as wilderness areas.

He has failed to do so because of fear of civil or criminal penalties being lodged against him. It is Huck's present intent to go to those same areas in the spring of 2025. Those areas include, but are not limited to,Seger's Hole, Chute Canyon, Pastures Road, Muddy River Road, Earnie's Canyon, Old Woman Wash, Mexican Mountain Road, June's Bottom Road, Copper Mine Road (north of Temple Wash), Saddle Horse Canyon, Salt Wash, San Rafael River Road, Iron Wash, the road through the "Blocks," Seger's Hole, Mexican Mountain Road, the road to the historic Swasey's Leap, and the June's Bottom Road, and all the recent road closures in the Labyrinth rims area and those in the San Rafael Swell.   In addition, the BLM installed, at great expense, a steel fence across the road to Scott's Basin in Deep Creek Mountains to keep people on vehicles out. This is a road that reaches a gorgeous viewpoint of the Ibapah valley and the only road that allows access into this mountain range.

18     Plaintiff, John Anderson ("Anderson"), is a United States citizen and resident of the State of Utah. Anderson is soon to be 88 years old and also has physical disabilities that prevent his access to public lands under the jurisdiction of the BLM. More particularly, Anderson has heart disease and skeletal degeneration. Anderson has been and is an avid all-terrain vehicle rider and is now prevented and deprived of the opportunity to visit scenic and recreational areas that he has previously been allowed to visit and enjoy.

Since the summer of 2020, Anderson had intended to go on all-terrain vehicle off-road trips utilizing one or more of the closed roads described in paragraph 2 above. It is his intent to immediately go on all-terrain vehicle off-road trips to areas which the BLM presently bars vehicular travel and/or which have been improperly designated as wilderness areas in the Spring of 2021. Anderson declined to go on those trips because of

fear of prosecution. Given Anderson's age and health-conditions, unless immediate injunctive relief as prayed for herein is granted, he will be denied the ability to visit the public lands described herein before he dies.

19    Huck and Anderson are hereinafter referred to collectively as "Plaintiffs."

20    Defendant United States of America ("United States") is the sovereign trustee of national natural resources not otherwise owned by private citizens and the states. In its sovereign capacity, the United States controls federal public lands, waters and other natural resources. The United States implements laws passed by Congress and institutes regulations adopted by its agencies.

21    Defendant the Bureau of Land Management ("BLM") is an agency within the Department of the Interior that has jurisdiction over the public lands in question.  The BLM is tasked with management of public lands and the administration and enforcement of the laws challenged herein.

# JURISDICTION AND VENUE

22    Jurisdiction is proper in this Court pursuant to Article III, Section 2 of the United States Constitution granting judicial power for all cases in law and equity arising under the Constitution, and the laws of the United States. Jurisdiction also is provided by 28 U.S.C. § 1331 because this lawsuit concerns the constitutionality of regulations and rules promulgated by the Defendants; and the constitutionality of the Dingell Act (as defined below). The Court also has jurisdiction to compel the BLM and its director to perform their duties pursuant to 28 U.S.C. § 1361.

23     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C.

§§ 2201 and 2202, by 5 U.S.C. §§ 702, 703, and 705; by Rules 57 and 65 of the Federal

Rules of Civil Procedure and by the general legal and equitable powers of the Court.

24     The Plaintiffs are of advanced age and suffering from significant health issues.

They have limited time in which to carry out their intent and desire to presently visit the

BLM-controlled lands as they have for many years in the past. They have been placed at

risk of fines and imprisonment by the "wilderness" designations and land use

management plans described herein and by the BLM's actual and threatened actions

against users of mechanized vehicles traveling upon geographic areas and roadways in

which the BLM has attempted to deny mechanized travel.

25     This case presents an actual case and controversy; the interests of the Plaintiffs are

adverse to those of the United States as to the laws that are the subject of this lawsuit and

the BLM, and the Court can provide a remedy by declaring and ordering that the subject

wilderness designations are unconstitutional and by declaring and ordering that the BLM

to allow public access to those areas as well as other areas closed off through land

management plans and other administrative actions.

26     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Defendants

exercise jurisdiction over lands in this district, Plaintiffs reside in this District, a

"substantial part of the events giving rise to the claim occurred" in this district, and the

geographic areas and rights at issue are involved here.

# FACTUAL BACKGROUND

27    The Wilderness Act, 16 U.S.C. §§ 1131 -1136, defines "wilderness" as:

(c) A wilderness, in contrast with those areas where man and his works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this Act an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

28    The Federal Land Policy and Management Act was enacted in 1976 and is codified at 43 U.S.C. §§ 1701 et seq. Pursuant to 43 U.S.C. § 1732(a), the public lands are to be managed "under principles of multiple use and sustained yield, in accordance with the land use plans developed … under section 1712 of [Title 43] when they are available, except that where a tract of public land has been dedicated to specific uses according to other provisions of law it shall be managed in accordance with such law." If 43 U.S.C. § 1732(a) was adhered to by the governing federal agencies, the Earth-religionists' goals would be thwarted.

29    43 U.S.C. § 1712 provides in relevant part:

Development, maintenance, and revision by Secretary

The Secretary shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands….

Criteria for development and revision

In the development and revision of land use plans, the Secretary shall –

use and observe the principles of multiple use and sustained yield set forth in this and other applicable law;

Use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences;

Give priority to the designation and protection of areas of critical environmental concern;

Consider present and potential uses of the public lands; … [and]

Weigh long-term benefits to the public against short-term benefits….


30    Contrary to the foregoing statute, the BLM and other government agencies tasked

with management of federal public lands, have developed land use plans that are

inconsistent with the terms and condition of the Act and have inappropriately revised

land use plans. The BLM and other government agencies have ignored the obligation to

provide for multiple uses of public lands under their jurisdiction. The BLM and other

governmental agencies have not utilized systematic interdisciplinary approaches or used

integrated considerations. The BLM and other government agencies have given priority

to designation and protection of areas that are not of critical environmental concern. The

BLM and other governmental agencies have not considered present and potential uses of

public lands, especially for the aged, disabled and handicapped. Instead, they have

uniformly discriminated against the rights of this most vulnerable population in favor of

the young, strong, and healthy.

31    Under the guise of the Wilderness Preservation Act of 1964, the BLM and other governmental departments and agencies, in concert with environmentalists and members of various Earth-religions, have increasingly claimed the public lands for their own benefit and uses, culminating in the present day where they have gained near total dominion of these lands and the managing agencies. For over 40 years, the BLM and other government agencies exercising management authority over federal public lands have been administratively closing roadways, trails, and accesses to public lands under their "Resource Management Plans" (RMPs). A relatively recent example of this collusion and conspiracy was the prohibition of motorized access to the Factory Butte recreation area described in the above paragraphs of this Complaint.

32    In violation of its current charter, the BLM (as well as other land management departments and agencies) has developed land use plans that are biased and discriminatory against aged, handicapped and disabled citizens of the United States who are now deprived of their ability to visit scenic and recreational areas to which they formerly had access.

33    In violation of its current charter, the BLM in its land use plans have identified potential wilderness areas which did not qualify for such designation under the FLPMA, and Congress has accepted the recommendations of the BLM and other government agencies and has designated land tracts as wilderness areas which fail to meet to the statutory definition of "wilderness" and are not of "critical environmental concern."

34    43 U.S.C. §1782(a) provided that the Interior Secretary was to have created an inventory of wilderness study areas. Wilderness areas were defined as "roadless areas of

13

5,000 acres or more" that possess "wilderness characteristics" defined in the Wilderness Act ...." Thus, under the current statutes, only land areas of at least 5,000 acres, that are roadless, and that possess wilderness characteristics should have been eligible for designation as wilderness areas.

35    In violation of its current charter, the BLM (as well as Congress and other land management departments and agencies) have ignored roadways and other human impacts that should have barred large tracts of land from being designated as wilderness areas.

36    The effort to designate more and more public lands as wilderness areas and/or to treat them as wilderness areas has been ongoing and systematic for decades. Even before such designations, the BLM began barring access to many lands, roads, trails and campsites that had historically been available to the aged, handicapped, and disabled via mechanized travel despite the fact that use of mechanized means caused no "damage" or "injury" to the land.

37    The BLM (as well as other departments and agencies) in concert and conspiracy with "environmental" organizations have thus systematically, with malice at worst and indifference at best, acted to deprive the aged, disabled, or handicapped, such as Plaintiffs, as well as the vast majority of public land users who chose or require the use of motor vehicles to access and travel on the public lands, from being able to access and travel upon many of the public lands.

38    Further, the actions of the BLM in ignoring its charter have extended discriminatory consideration and incentive to muscle powered users, which represent a minority of real and potential users, creating an elite class with special and superior rights while blatantly

discriminating against others, particularly the aged, disabled and handicapped.  In effect, the BLM's policies have created a modern-day version of "the King's forest" where only the chosen elite are permitted entry and the common man is barred.

39    These acts of discrimination have been justified by unconstitutional metaphysical and religion based arguments involving the "protection" or "preservation" of the land.  These terms are placed in quotations because they are anthropocentric and completely devoid of any rational meaning as applied to nearly all tracts of BLM-controlled land (and wilderness in particular), which can neither be damaged or destroyed by any human action.

40    Our public lands are increasingly being set aside for adherents of the Environmentalist dogma and closed to those persons who desire or require the use of motor vehicles to travel on and access choice places on these lands.  So striking has this trend been, that access for the aged, handicapped and disabled to public lands has diminished from more than 95% of BLM-controlled land in 1976 to less than 5% currently.   Compare this to access provided to muscle powered users which began at 100% and is still at 100% today.  (These figures do not apply to military reservations or Indian Tribal Lands.)

41    Substantial funds and rights to access have been provided by lavish facilities for mountain bikes in the Moab, Utah area; any damage from which would exceed any damage caused by mechanized travel by the aged, disabled or handicapped.

42    Campsites used by mechanized traveler have been closed allegedly out of concern for contamination of waterways from human wastes, ignoring the fact that most

mechanized travelers have equipment to contain human wastes. In contrast, campsites have been opened up for mountain bikers and hikers who reside in tents and generally lack such equipment.

43    The BLM has denied access to some roads by digging up sections of road with heavy equipment, making the roads impassable to mechanized travel, and thus severely impacting the land from the digging and earth gouging that far exceeds any alleged damage that had or could have resulted from mechanized travel.

44    The San Rafael Swell area was not "pristine" and "untrammeled," but was instead mined extensively in the 1950s and 1960s, with many roads built in connection with the mining activities throughout that area. Nevertheless, in violation of its charter, the BLM has been closing the mines and eliminating the roads. None of these areas are of "critical environmental concern."

45    Many closure designations of wilderness study areas and in RMPs for public lands have been the result of "settlements" of collusive lawsuits between various "environmental religion" groups and the government agencies. As part of the settlement agreements, commissions or committees are established to determine the uses of public land, but the aged, disabled and handicapped are denied due process and have no ability to influence the decisions of the various commissions or committees to provide mechanized access to scenic areas for the handicapped and disabled. While purporting to preserve wilderness areas for all Americans, the wilderness designations effectively only allow access by the able-bodied.

46    Plaintiffs have a present intent and desire to use their motorized vehicles to travel over Roads and trails which have been closed off by the BLM in the New Wilderness Areas and other areas described in this Complaint. Plaintiffs have not acted upon their present intent and desire to do so because of legitimate fear of fines and/or imprisonment.

47    The Plaintiffs' fear of fines and imprisonment should they go upon roads or other areas in the New Wilderness Areas is well-founded based upon actions by the BLM. More particularly:

48    In 2014, a San Juan County Commissioner, Phillip Lyman, was found guilty of conspiring to operate off-road vehicles on public lands closed to off-road vehicles. Mr. Lyman was sentenced to ten days in jail, fined $1,000 and ordered to pay restitution of nearly $100,000 in Case No. 2:14-cr-00470-DN-1 in this district court.

49    43 CFR § 6302.20 warns the public that: "Except as specifically provided in the Wilderness Act, the individual statutes designating the particular BLM wilderness area, or the regulations of this part, and subject to existing rights, in BLM wilderness areas you must not: … (d) Use motorized equipment; or motor vehicles … or other forms of mechanical transport."

50    43 CFR 6302.30 provides in relevant part: "(a) If you commit a prohibited act listed in § 6302.20 in a BLM wilderness area, you are subject to criminal prosecution on each offense. If convicted, you may be fined not more than $100,000 under 18 U.S.C. 3571. In addition, you may be imprisoned for not more than 12 months, as provided for by 43 U.S.C. 1733(a).

51    The Merriam-Webster dictionary defines "religion" as "a personal set or institutionalized system of religious attitudes, beliefs, and practices" and "a cause, principle, or system of beliefs held to with ardor and faith." The Stanford Encyclopedia of Philosophy generally defines a "religion" as involving "a communal, transmittable body of teachings and prescribed practices about an ultimate, sacred reality or state of being that calls for reverence or awe, a body which guides its practitioners into what it describes as a saving, illuminating or emancipatory relationship to this reality through a personally transformative life of prayer, ritualized meditation, and/or moral practices like repentance and personal regeneration."

52    By any such definitions, the Defendants support and promote Earth-religion tenets. They have religious attitudes, beliefs and practices that attempt to "preserve" and protect "Gaia" or "Mother Earth" from even reasonable uses, believing that roads scar and that mines pierce and harm "Her." They view the Earth as being sacred and an object to be revered and held in awe. They seek to "commune" with Her and engage in "moral practices" which essentially view mankind as a contaminant and a curse upon Her.

53    The BLM has violated the First Amendment to the United States Constitution in that it has assisted the establishment of these Earth-religions.

# FIRST CAUSE OF ACTION

(Resource Management Plans Issued by the BLM Denying Access to Mechanized Travel Violates the First Amendment.)

Plaintiffs incorporate by reference the allegations of above paragraphs.

54     The First Amendment to the United States Constitution provides in relevant part that: "Congress shall make no law respecting establishment of religion…."

55     Congress has violated the Establishment Clause of the First Amendment by passing the Dingell Act and other laws which violate the FLPMA and ignore the definition of "wilderness" as set forth in those statutes.

56     Congress has previously violated the Establishment Clause by passing the Washington County Wilderness Act which closed mechanized access to land known as "Canaan Mountain" south of Zions National Park. This "wilderness" area did not qualify for such designation because it had been heavily logged to provide lumber for St. George, Utah and contained an historic sawmill. This area was accessed by mechanized travel via the Canaan Mountain Sawmill Road which the BLM administratively closed in the 1970s, but which was used and continued to be used by local residents.

57     The designation of additional "wilderness" areas has been done to support and establish the Earth-religions and their tenets regarding the "sacredness" of public lands.

58     The BLM has violated the Establishment Clause of the First Amendment by closing lands to mechanized access to many lands within recreation areas or under RMPs in support of Earth-religions and their tenets regarding the "sacredness" of public lands.

59     As a result of the establishment of these Earth-religions by the Defendants, Plaintiffs have suffered, and will continue to suffer, irreparable injury, including but not limited to being denied access to the wilderness and other areas described in this

Compliant. More particularly, given their ages, disabilities and handicaps, Plaintiffs will be denied the ability to view, enjoy and recreate upon the newly-designated Wilderness Areas and upon lands which have been closed off from mechanized access by the BLM in violation of its statutory charter and in violation of FLMPA.

60    Plaintiffs are entitled to a declaration that the Dingell Act and the establishment of RMPs for land under BLM-jurisdiction violates the Establishment Clause of the First Amendment. Plaintiffs are entitled to immediate and permanent injunctive relief against defendants denying the Plaintiffs mechanized access to roadways and trails and other areas formerly open to the public but which have now been closed pursuant to RMPs.

# SECOND CAUSE OF ACTION

(Declaratory Judgment that the Dingell Act's Designation of Certain Areas of Wilderness in Emery County and the Administrative closures over many years by the Bureau of Land Management, including the abusive recent closures to people on motor vehicles in the Labyrinth Canyons area and the San Rafael Swell, violate the Due Process Clause of the Constitution and Denies Equal Protection to the Aged, Handicapped and Disabled)

Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs.

61    The Due Process Clause of the Fifth Amendment provides in relevant part: "nor

shall any person … be deprived of life, liberty, or property, without due process of law."

U.S. Const. amend. V.

62    The Fifth Amendment contains an "implicit" "equal protection principle" binding

the federal government. Sessions v. Morales-Santana, U.S.137 S.Ct. 1678, 1686 (2017).

63    Legislation that imposes irrational requirements or that makes irrational distinctions

violates the Due Process Clause.

64    The Administrative Procedures Act requires the Court to hold unlawful and set

aside any agency action that is, among other things, (a) arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with the law; (b) contrary to constitutional

right, power, privilege, or immunity, and (c) in excess of statutory jurisdiction, authority,

or limitations, or short of statutory right. 5 U.S.C. § 706(2).

65    The BLM is an "agency" under the Administrative Procedures Act, 5 U.S.C. §

551(1), and the regulations and rules promulgated or that will be promulgated under the

Dingell Act are "rules" under the Administrative Procedures Act, 5 U.S.C. § 551(4).

66    The Defendants have violated the Due Process Clause by denying the Plaintiffs,

who are aged, handicapped and disabled, equal protection and reasonable access to scenic

and recreational areas enjoyed by the able-bodied based upon arbitrary and capricious

reasoning or abuses of discretion.

67    The Defendants have violated the Due Process Clause by denying the Plaintiffs and

other similarly situated individuals any real input or ability to protect their interests in the

decision-making process regarding the designation of wilderness areas. More

particularly, much is said as to how all stake holders and interested parties were given the opportunity to participate in the process leading to the development of the SRRA Wilderness legislation.   That assertion was false.   Plaintiff Anderson attended nearly every meeting of the Emery County Public Lands Council.   For this commitment he was ridiculed, insulted, humiliated and marginalized in an attempt to silence his voice.   Every other advocate for motorized access to these public lands were similarly treated and left in disgust.  Plaintiff Anderson stayed. Despite his age and disability, he traveled the 300-mile round trip many times in a vain attempt to bring balance to the proceedings.  The fix was in, however, and the outcome pre-ordained.

68    The Defendants have violated the Due Process Clause by designating as wilderness areas large tracts of land in the New Wilderness Areas which are not of "critical environmental concern."  Because of the Defendants' actions, Plaintiffs have suffered, and will continue to suffer, irreparable injury.

69    Plaintiffs are entitled to a declaration that the Dingell Act violates the Due Process Clause of the Fifth Amendment.

70    Plaintiffs also are entitled to a declaration that the actions of the BLM in instituting RMPs and engaging in other acts that deny the Plaintiffs and others similarly situated to roads, trails and other areas to which the public has had access using mechanized travel violates the Due Process Clause of the Fifth Amendment.

71  Plaintiffs are entitled to immediate and permanent injunctive relief preventing Defendants from closing roads, trails, and access to areas previously available to

mechanized or motorized travel in the New Wilderness Areas, recreational areas, or otherwise implementing the Dingell Act and RMPs is unlawful and unconstitutional.

# THIRD CAUSE OF ACTION:   CHEVRON DEFERENCE

72    The recent U.S. Supreme Court decision reversing **Chevron deference**, which previously gave federal agencies significant latitude in interpreting ambiguous statutory provisions, provides an opportunity to challenge agency decisions that exceed or conflict with statutory authority. This legal argument asserts that the Bureau of Land Management's (BLM) longstanding policies closing the majority of its lands to motorized travel while permitting unrestricted access for muscle-powered travel violate statutory mandates and constitutional principles, particularly in light of the Court's rejection of deference to agency interpretations.

73    Under Chevron U.S.A., Inc. v. Natural Resources Defense Council (1984), courts deferred to reasonable agency interpretations of ambiguous statutes. However, the Supreme Court's recent decision limits agency discretion by holding that courts must apply stricter scrutiny to ensure agency actions align with clear statutory language and Congressional intent.

74    The relevant statutes governing the BLM's authority include the **Federal Land Policy and Management Act (FLPMA)** and the **National Environmental Policy Act**

(**NEPA**). FLPMA directs the BLM to manage public lands for multiple use and sustained

yield, balancing environmental protection with recreational, industrial, and other uses.

NEPA imposes procedural requirements for assessing environmental impacts but does

not provide substantive land-use restrictions.

75    **Legal Argument**

1. **The BLM's Actions Contravene the Plain Language of FLPMA**
   - o  FLPMA mandates that public lands be managed for **multiple use** and **sustained yield**. "Multiple use" is defined under 43 U.S.C. § 1702(c) to include recreational, scientific, cultural, and economic activities without prioritizing one use over another.
   - o  By disproportionately closing lands to motorized travel while permitting unlimited access for muscle-powered travel, the BLM has effectively prioritized certain recreational uses over others. This preferential treatment conflicts with FLPMA's requirement for balanced management and fails to ensure fair access for all types of users.
   - o  The Supreme Court's decision reversing Chevron deference requires courts to strictly interpret FLPMA's language. The BLM's preferential closures lack statutory support and contravene the multiple-use mandate.
2. **The BLM's Actions Represent Arbitrary and Capricious Decision-Making**
   - o  Under the **Administrative Procedure Act (APA)**, agency actions must not be arbitrary, capricious, or an abuse of discretion. The BLM's closure policies disproportionately burden motorized travelers, including individuals with disabilities and those requiring motorized access due to age or other limitations, without a clear and rational basis.
   - o  The agency has not provided sufficient evidence that motorized travel universally causes greater environmental harm than other forms of travel. Blanket closures, rather than targeted and justified restrictions based on environmental need, fail to meet the APA's standards.
3. **Constitutional Concerns: Equal Protection and Disability Discrimination**
   - o  The Fifth Amendment's Due Process Clause encompasses principles of **equal protection**. The BLM's policies effectively discriminate against certain classes of public land users (motorized travelers) while favoring others (muscle-powered travelers), raising questions of fairness and equal treatment.
   - o  Furthermore, the disproportionate impact on individuals with disabilities may violate the **Rehabilitation Act of 1973** and the **Americans with Disabilities Act (ADA)**, which prohibit federal agencies from implementing policies that discriminate based on disability.
4. **Procedural Violations under NEPA**

    o   NEPA requires agencies to analyze the environmental impacts of their decisions through **Environmental Assessments (EAs)** or **Environmental Impact Statements (EISs)**. The BLM must consider alternatives that provide equitable access for diverse user groups while minimizing environmental harm.

    o   If the BLM's decisions were based on flawed or incomplete NEPA analyses, those decisions may be invalidated. The Supreme Court's reversal of Chevron deference strengthens the judiciary's role in scrutinizing procedural compliance and ensuring agency accountability.

76    The Supreme Court's reversal of Chevron deference underscores the judiciary's duty to enforce statutory mandates and check agency overreach. The BLM's closure policies, which disproportionately restrict motorized travel while permitting unrestricted muscle-powered access, conflict with FLPMA's multiple-use mandate, violate principles of fairness and equal protection, and may contravene procedural requirements under NEPA. A court applying the post-Chevron standard should hold the BLM accountable for exceeding its statutory authority and impose remedies to ensure balanced and equitable access to public lands.

# Forth Cause of Action:   Sackett v EPA and West Virginia v EPA

77    The U.S. Supreme Court's decision in *Sackett v. Environmental Protection Agency*, 598 U.S. ___ (2023), provides a framework for assessing the Bureau of Land Management's (BLM) extensive restrictions on motor vehicle access to public lands. In *Sackett*, the Court clarified the scope of the Environmental Protection Agency's (EPA) authority under the Clean Water Act, emphasizing the necessity for clear statutory authorization when federal agencies impose significant regulatory measures. This precedent can be applied to evaluate whether the BLM's actions align with its statutory mandate and constitutional principles.

### 1. Statutory Authority and the Major Questions Doctrine

78    In *Sackett*, the Supreme Court underscored that federal agencies must operate within the bounds of authority explicitly granted by Congress. The Court rejected the EPA's expansive interpretation of "waters of the United States," highlighting the need for clear congressional authorization when agencies undertake significant regulatory actions.

79    Similarly, the BLM's widespread closures of public lands to motor vehicle access, while permitting unrestricted muscle-powered travel, constitute substantial regulatory actions affecting public land use and access. The Federal Land Policy and Management Act (FLPMA) of 1976 grants the BLM authority to manage public lands under principles of multiple use and sustained yield. However, FLPMA does not explicitly authorize the BLM to impose broad prohibitions on motorized access while allowing other forms of travel. Applying the major questions doctrine from *Sackett*, such significant policy decisions require clear congressional authorization, which appears absent in this context.

### 2. Arbitrary and Capricious Action under the Administrative Procedure Act (APA)

80    The APA prohibits agency actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The BLM's differential treatment—restricting motor vehicle access while allowing muscle-powered travel—raises concerns of arbitrary action. This policy disproportionately affects individuals who rely on motorized access, including those with disabilities or those traveling longer distances, potentially violating principles of equitable access mandated by FLPMA.

### 3. Equal Protection and Non-Discrimination

81    The BLM's policies may infringe upon constitutional principles of equal protection by favoring one class of public land users over another without a rational basis. By allowing muscle-powered access while restricting motorized access, the BLM's actions could be viewed as discriminatory, lacking a clear and rational justification for such differential treatment.

### 4. Procedural Deficiencies and Lack of Public Participation

82    *Sackett* emphasizes the importance of proper procedural conduct by federal agencies. The BLM's implementation of motor vehicle restrictions may have lacked adequate public notice, opportunity for comment, and comprehensive environmental assessments. Such procedural deficiencies undermine the legitimacy of the BLM's actions and may render the restrictions invalid under the APA.

### Conclusion

83    The Supreme Court's decision in *Sackett v. EPA* provides a compelling basis to challenge the BLM's extensive motor vehicle restrictions on public lands. The BLM's actions appear to exceed its statutory authority under FLPMA, lack clear congressional

authorization for such significant policy decisions, and may constitute arbitrary and capricious action under the APA. Additionally, the differential treatment of motorized versus muscle-powered access raises constitutional concerns regarding equal protection and non-discrimination. A legal challenge grounded in these arguments could seek to invalidate the BLM's motor vehicle restrictions and promote equitable access to public lands for all users.

### Application of *West Virginia v. EPA* to Bureau of Land Management's (BLM) Motor Vehicle Restrictions

84   The recent U.S. Supreme Court decision in *West Virginia v. EPA* (2022) provides a framework for challenging agency actions that exceed statutory authority or fail to adhere to the major questions doctrine. This case, involving the Environmental Protection Agency (EPA), emphasized that administrative agencies must act within clear congressional authorization when addressing significant policy questions. This legal precedent can be extended to the Bureau of Land Management's (BLM) restrictions on motor vehicle use across its managed lands.

## 1. Major Questions Doctrine and Lack of Congressional Authorization

85    The major questions doctrine, as articulated in *West Virginia v. EPA*, requires that federal agencies demonstrate clear congressional authorization when implementing policies with significant economic, political, or social impacts. The BLM's long-standing practice of restricting motor vehicle access across vast areas of public lands, while simultaneously allowing unrestricted access by individuals traveling on foot, arguably constitutes a significant policy decision that has profound implications for public land use, recreation, and access.

Congress has not explicitly authorized the BLM to impose such sweeping motor vehicle restrictions in the Federal Land Policy and Management Act (FLPMA) of 1976 or other relevant statutes. While FLPMA grants the BLM the authority to manage public lands to prevent unnecessary degradation and ensure multiple-use principles, it does not explicitly prioritize muscle-powered travel over motorized travel. The BLM's actions appear to represent a policy preference not explicitly endorsed by Congress, raising questions about whether the agency has exceeded its statutory authority under the major questions doctrine.

## 2. Unequal Treatment and Potential Arbitrary Action

86   The BLM's approach, which favors muscle-powered travel over motorized travel, may constitute arbitrary and capricious action under the Administrative Procedure Act (APA). In *West Virginia v. EPA*, the Court emphasized that agency actions must have a clear statutory foundation and rational justification. The BLM's exclusion of motor vehicles from large swaths of public land, without imposing equivalent restrictions on

other forms of access, could be interpreted as a failure to treat similarly situated users equitably.

Motorized vehicles are often the only practical means of access for individuals with disabilities, older individuals, or those traveling long distances. By effectively privileging muscle-powered travel, the BLM's policies may discriminate against certain groups, creating barriers to equitable access to public lands and violating the spirit of FLPMA's multiple-use mandate.

### 3. Federalism and Local Economic Impact

87    The decision in *West Virginia v. EPA* also highlights the importance of respecting the balance of federal and state authority, as well as the economic impact of agency decisions. The BLM's motor vehicle restrictions may significantly affect local economies that depend on motorized recreation, hunting, and tourism. These restrictions can reduce opportunities for local businesses and communities to benefit from public land use, raising concerns about whether the BLM has adequately considered the broader economic and social implications of its policies.

### 4. Procedural and Substantive Issues in Rulemaking

88    The BLM's motor vehicle restrictions may lack sufficient procedural justification. Under *West Virginia v. EPA*, the Court scrutinized whether the EPA followed proper rulemaking processes and ensured that its actions were grounded in statutory text and congressional intent. Similarly, the BLM's motor vehicle policies may fail to meet procedural requirements if they have not been subject to adequate public input, environmental analysis, or congressional oversight.

### Conclusion

89    The principles established in *West Virginia v. EPA* provide a strong legal foundation for challenging the BLM's motor vehicle restrictions. Specifically, the major questions doctrine, concerns about arbitrary and capricious action, federalism, and procedural deficiencies all suggest that the BLM may have exceeded its statutory authority in enacting such policies. A successful legal challenge could argue that the BLM's policies lack clear congressional authorization and fail to respect the principles of equitable access, multiple-use management, and procedural fairness required under federal law.

# REQUEST FOR RELIEF

Plaintiffs seek a declaration that the BLM's restrictions on motorized access are unconstitutional, discriminatory, and exceed statutory authority.

Plaintiffs seek an immediate injunction preventing the enforcement of all closures and restrictions made since the passage of the Federal Land Policy Management Act (FLPMA).

Plaintiffs seek an immediate injunction requiring the BLM to restore access for motor vehicle travelers to the same extent granted to those who travel by muscle power.

Plaintiffs seek an immediate injunction requiring the BLM to restore access to all primitive and dispersed campsites entirely closed or modified to discriminate against those using campers, trailers, or motorhomes.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

A declaration that Defendants' actions violate federal law, including the APA, ADA, and the Equal Protection Clause.

An injunction preventing Defendants from enforcing policies that disproportionately restrict motorized access to public lands.

An order requiring Defendants to implement policies ensuring equal access for individuals with disabilities and mobility impairments to all lands under their jurisdiction

An award of attorneys' fees and costs as allowed by law.

Such other relief as the Court deems just and proper.

Respectfully submitted this 14th day of March, 2025

_____

Rainer F. Huck                                    John Anderson

Rainer F. Huck
Pro Se
1680 East Atkin Avenue
Salt Lake City, Utah 84106
(801) 201-9660
rfhuck@yahoo.com

John Anderson
Pro Se
629 Lake Street #3
Salt Lake City, Utah 84102
(801) 688-3192
landlord@sisna.com